# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GEORGE J. MADERA, M.D.,**

      **Plaintiff,**

**v.**

**TAOS HEALTH SYSTEMS, INC., D/B/A HOLY CROSS HOSPITAL,**
**BOARD OF DIRECTORS OF HOLY CROSS HOSPITAL,**
**MEDICAL STAFF OF HOLY CROSS HOSPITAL, and**
**JOHN DOES 1-10,**

      **Defendants.**

## COMPLAINT FOR DAMAGES ARISING FROM BREACH OF CONTRACT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECOMONIC RELATIONS, <u>AND DEFAMATION</u>

Plaintiff George J. Madera, M.D., complains of Defendants as follows:

## <u>THE PARTIES</u>

1.      Plaintiff is a Board Certified general and interventional cardiologist who has over 40 years of experience practicing medicine.  He worked for Defendant Taos Health Systems, Inc. d/b/a Holy Cross Hospital as a locum tenens physician from December 3, 2018, until March 8, 2019.  Plaintiff is a resident of the State of California.

2.      Defendant Taos Health Systems, Inc. d/b/a Holy Cross Hospital ("Hospital") is a New Mexico nonprofit corporation with its principal place of business in the State of New Mexico. The Hospital maintains and operates medical institutions, including an accredited acute care general hospital known as Holy Cross Medical Center in Taos, New Mexico.

3.      Defendant Board of Directors of Taos Health Systems, Inc. d/b/a Holy Cross Hospital ("Board") of the Hospital controls the business and affairs of the Hospital, including,

without limitation, establishing polices to guide the operation of the Hospital. All officers, practitioners, allied health professionals, employees and agents of the Hospital are subject to control, direction, and removal by the Board. The Board is responsible for final actions on all matters relating to medical staff appointments, clinical privileges, corrective action, and the Hospital's medical staff bylaws. The Board is also responsible for ensuring that adverse recommendations regarding practitioners' medical staff appointments, reappointments, and/or clinical privileges, be accomplished in accordance with the approved fair hearing plan then in effect at the Hospital.

4.      Defendant Taos Health Systems, Inc. d/b/a Holy Cross Hospital Medical Staff ("Hospital Medical Staff") is an unincorporated legal entity comprised of the physicians and other practitioners who have been granted clinical privileges at the Hospital. The Hospital Medical Staff has the responsibility and authority to investigate and evaluate matters relating to medical staff appointment status, clinical privileges, and corrective action. The Hospital Medical Staff, through its appropriate officers and committees, is required to adopt and forward to either the Medical Executive Committee or the Joint Conference Committee specific written recommendations regarding medical staff appointment status, clinical privileges, and corrective action, along with appropriate supporting documentation that will allow the Hospital Medical Staff to make a recommendation to the Board.

5.      Defendants John Does 1-10 are members of the Hospital, the Board, the Hospital Medical Staff, the Medical Executive Committee, the Credentials Committee, and/or employees or agents of the Hospital, the Board, the Hospital Medical Staff, the Medical Executive Committee, and/or the Credentials Committee who were involved in the events giving rise to the Plaintiff's claims as described herein. Plaintiff is unaware of the true names and capacities, whether

individual, corporate, associate, or otherwise, of the Defendants sued herein as John Does 1-10, and for that reason sues said Defendants, and each of them, by such fictious means.

## JURISDICTION & VENUE

6.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332, because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue is proper in the District of New Mexico under 28 U.S.C. § 1391(b)(1)&(2).

## ALLEGATIONS COMMON TO ALL COUNTS

8.     Plaintiff was born in Los Angeles, California.  He grew up poor.

9.     Plaintiff's father emigrated to the United States at the age of 18 and worked as a gardener in and around Beverly Hills.  Plaintiff began working alongside his father at the age of five.  Plaintiff learned the value of hard work through these early experiences.

10.    Plaintiff's mother was born in Tasco, Arizona, an old railroad town.  His mother helped teach him how to read and write.  She got Plaintiff a library card when he was very young, and the library card changed his life when he began to read.

11.    Plaintiff worked hard in primary school.  He was admitted to UCLA as an undergraduate student in 1963.  Plaintiff's studies at UCLA were interrupted by the Vietnam War.  He was drafted into the United States Army in 1965 while he was working full-time and going to school part-time.

12.    Plaintiff was recommended, applied, and selected to Officer Candidate School, Infantry, in Fort Benning, Georgia, during the Vietnam War.  He graduated second in his class and received orders which included Ranger School.  Plaintiff received his Ranger Tab and was in

Special Operations throughout his military career. Plaintiff excelled in serving his country and earned a spot with the Special Forces as an Army Ranger while serving in Vietnam.

13.     Plaintiff returned to the United States after his military service and attended Stanford University to complete his undergraduate studies. He graduated from Stanford University in 1973. Plaintiff went on to complete medical school, a medical internship, and his medical residency at Stanford University.

14.     From approximately 1981 to 2019, Plaintiff practiced general and interventional cardiology at various hospitals across the country. He worked as an employed physician and as a locum tenens physician. Plaintiff has approximately 40 years of experience practicing general and interventional cardiology, and he has worked in dozens of health care institutions across the country.

15.     Over the last 20 years, Plaintiff has primarily worked as a locum tenens physician. He has completed approximately 35 separate locum assignments at approximately 20 different institutions during that time. Some of those assignments have been reoccurring assignments, meaning that the health care institution invited Plaintiff back for multiple assignments.

16.     Plaintiff has gone through the credentialing process at each institution where he has worked and for each locum assignment he has held. Plaintiff never had any trouble with the credentialing process. No state licensing bodies had ever taken action against Plaintiff's medical licenses before the events giving rise to this lawsuit, and his clinical privileges had never been limited, revoked, or suspended. Prior to the events giving rise to this lawsuit, Plaintiff held medical licenses in twelve States.

17.     In the late summer of 2018, Plaintiff received a call from a recruiter named Bo Ehmke. Mr. Ehmke worked for a healthcare staffing agency named Delta Locum Tenens, LLC

("DLT").  DLT works to place physicians in full-time and part-time assignments with hospitals and clinical care facilities throughout the United States.  DLT had a staffing agreement in place with the Hospital in the late summer of 2018.

18.    Mr. Ehmke informed Plaintiff during the call that the Hospital's only cardiologist, Geilan Ismail, M.D., planned to retire at the end of the year.  As a result of Dr. Ismail's upcoming retirement, the Hospital was looking to fill a locum tenens position in general cardiology.

19.    Plaintiff spoke to Dr. Ismail about the position over the phone.  Dr. Ismail told Plaintiff at the end of the call that she would recommend him for the position.  In late October of 2018, Plaintiff decided to formally apply for the position at the Hospital.  To do so, Plaintiff submitted various forms and documents to the Hospital between October and December of 2018.

20.    One of those documents, titled, "Acknowledgement of Receipt and Understanding of Appendix A and Appendix B of Holy Cross Hospital Peer Review Policy," asked Plaintiff to acknowledge that he had read and understood the Hospital's Peer Review Policy.

21.    The Acknowledgement also stated: "As per the Peer Review Policy, the requirement is to notify all involved practitioners of any and all cases as they come to review regardless of the degree of involvement or of any PSC finding.  If you wish to opt out of this initial notification please indicate this by declining below."

22.    Plaintiff did not opt out of receiving notification of any and all cases as they came to review by the Hospital or Hospital Medical Staff.

23.    In another document completed during the credentialing process, Dr. Madera formally acknowledged that he had read and agreed to abide by the Hospital's medical staff bylaws, rules and regulations, and applicable Hospital policies, which included the Hospital's Peer

Review Policy, Fair Hearing Plan, and Credentialing and Privileging Plan (collectively referred to herein as the "Medical Staff Bylaws").

24.     The Medical Staff Bylaws, rules and regulations, and applicable Hospital policies, including the policies and procedures incorporated therein, such as the Peer Review Policy, the Fair Hearing Plan, and the Credentialing and Privileging Plan, created a binding contract between Plaintiff and Defendants.  Defendants had a duty to comply with the Medical Staff Bylaws, including the policies and procedures incorporated therein.

25.     Article IX of the Medical Staff Bylaws outlines the requirements for taking corrective action against practitioners who hold clinical privileges at the Hospital.

26.     Article XIV of the Medical Staff Bylaws sets forth the requirements governing formal hearings and appeals from those hearings.

27.     Article XIV states that "[a]dverse recommendations or actions on the following which involve the competence or professional conduct of a practitioner shall entitle the practitioner affected to an opportunity for a hearing: … revocation of clinical privileges."  [Article XIV, Medical Staff Bylaws, p. 22]

28.     Article XIV also states that the "Hospital shall promptly give written notice of the adverse recommendation or action to the practitioner[,]" and the "notice of adverse recommendation or action shall set forth a summary of the practitioner's rights under these Hearing and Appeal Procedures and other information as may be required by law."  [Article XIV, Medical Staff Bylaws, p. 24]

29.     Article XIV requires the notice to state: that an adverse recommendation or action has been made or is proposed to be made; the reasons for the action or recommendation; that the practitioner has a right to request a hearing on the action or recommendation in accordance with

the Medical Staff Bylaws at any time within 30 days after receipt of the notice; that failure to request a hearing shall constitute a waiver of a right to a hearing; that if a hearing is requested on a timely basis, he or show will be given further notice stating the time, place and date of the hearing, and a list of witnesses, if any, expected to testify at that if the practitioner so requests in writing, he or she will be given reasonable access to relevant records, reports and other materials related to the adverse action on which the Medical Executive Committee or the Board, as the case may be, intends to rely and which are not otherwise privileged under law; and that the notice of adverse action or recommendation shall state that in the hearing, the practitioner has the right to representation by an attorney, physician or other person of his or her choice; to have a record made of the proceedings, copies of which may be obtained by the practitioner upon payment of one-half of any reasonable charges associated with the taking, preparation and transcribing of it; to call, examine and cross-examine witnesses; to present evidence determined to be relevant by the hearing officer or panel, regardless of its admissibility in a court of law; to submit a written statement at the close of the hearing; and upon completion of the hearing, to receive the written recommendation of the hearing officer or panel, including a statement of the basis for the recommendations.  [Article XIV, Medical Staff Bylaws, pp. 24-25]

30.     Article XIV of the Medical Staff Bylaws further states that a "practitioner shall have 30 days following his or her receipt of notice of adverse action to request a hearing."  [Article XIV, Medical Staff Bylaws, p. 25]

31.     Article XIV of the Medical Staff Bylaws require that, "[w]ithin ten days after receipt of a request for a hearing, the Hospital shall schedule and arrange for a hearing[,]" and that, "[t]he Chief of Staff shall send a written notice to the practitioner of the place, time and date of the hearing at least 30 days in advance."  [Article XIV, Medical Staff Bylaws, p. 26]

32.     Article XIV of the Medical Staff Bylaws go onto to set forth requirements regarding hearing procedure, conduct of the hearing, preparation of a hearing report, initiation of Board action, initiation of appellate review by the Board, appellate review prerequisites, appellate review procedure, appellate review hearing, the decision on appellate review, and the final decision by the Board. [Article XIV, Medical Staff Bylaws, pp. 26-29]

33.     Article XV of the Medical Staff Bylaws governs Data Bank and Self-Reporting. [Article XV, Medical Staff Bylaws, p. 30]  Article XV requires the Hospital Medical Staff to "comply with the reporting requirements of law, including HCQIA [Health Care Quality Improvement Act], governing professional review actions."  [Article XV, Medical Staff Bylaws, p. 30]

34.     Article XV of the Medical Staff Bylaws also sets forth the requirements for reporting certain adverse actions against a practitioner's clinical privileges to the New Mexico Medical Board, such as professional review actions that adversely affect the clinical privileges of a physician.  [Article XIV, Medical Staff Bylaws, p. 31]

35.     Article XV of the Medical Staff Bylaws also refers to and incorporates the Hospital's Credentialing and Privileging Plan.  [Article XIV, Medical Staff Bylaws, p. 30]

36.     The Hospital's Credentialing and Privileging Plan requires the Credentials Committee to prepare a written report to the Medical Executive Committee prior to reducing or revoking a practitioner's clinical privileges.  [Credentialing and Privileging Plan, Section 14]

37.     The Medical Executive Committee is then required to prepare a subsequent report to the Board which sets forth the Medical Executive Committee's recommendations.  If the Medical Executive Committee's recommendation would reduce or revoke a practitioner's clinical privileges, then the report to the Board shall set forth the reasons, and in such event, the Chief of

Staff shall promptly notify the appointee as provided in the Fair Hearing Plan.  In such case, the Medical Staff member or other individual exercising clinical privileges may be entitled to the procedural rights provided in the Fair Hearing Plan only to the extent provided in the Fair Hearing Plan.  [Credentialing and Privileging Plan, Sections 14-15]

38.     It is the Board who has the responsibility to pursue final action on the Medical Executive Committee's recommendations.  [Credentialing and Privileging Plan, Sections 14-15]

39.     Patricia Hendricks was the Medical Staff Coordinator at the Hospital at the time of Plaintiff's locum assignment.  As the Medical Staff Coordinator, she was responsible for credentialing providers at the Hospital, and she had general knowledge regarding clinical privileges at the Hospital as well.

40.     Ms. Hendricks oversaw the credentialing of Plaintiff.  The credentialing process did not reveal any previous issues or concerns with Plaintiff, either clinical or behavioral. Plaintiff's background check also came back clean.  Plaintiff was formally credentialed by the Hospital in the days leading up to December 3, 2018.

41.     The Hospital Medical Staff also granted Plaintiff clinical privileges to provide general cardiology services within the Hospital.  Plaintiff was initially granted clinical privileges for a 60-day period running from December 3, 2018, to February 3, 2019.  He was later granted clinical privileges for a second 60-day period which ran from February 4, 2019, to April 4, 2019.

42.     Plaintiff's first day at the Hospital was December 3, 2018.  Plaintiff spoke with Mr. Jeffrey Gardner on the first day of his assignment, as Mr. Gardner was Plaintiff's assigned supervisor at the time.  Mr. Gardner gave Plaintiff his assignment details and laid out the expectations regarding Plaintiff's scope of work at the Hospital.

43.     Mr. Gardner specifically told Plaintiff that part of his job at the Hospital was to grow the hospital-side and office-side cardiology departments.  Doing so would require Plaintiff to address scheduling-related issues and improve efficiency with those processes.

44.     Mr. Gardner left the Hospital in the days following the first meeting with Plaintiff on December 3, 2018.  Mr. Jeff Schenck took over for Mr. Gardner upon his departure.  Among his other duties at the Hospital, Mr. Schenck managed the clinical scheduling staff.

45.     Plaintiff quickly realized that there were scheduling-related issues within the cardiology department which were affecting patient care.  Plaintiff noticed that referring providers would occasionally order the wrong cardiology tests, which would force Plaintiff to interact with scheduling staff to correct the error.  Plaintiff also noticed that there were significant delays in scheduling patients for cardiology tests.

46.     Plaintiff attempted to resolve these issues and concerns by working directly with the scheduling office and the scheduling staff.  He was not shy about voicing his concerns about the scheduling problems within the Hospital.  From Plaintiff's perspective, the scheduling issues raised serious concerns about patient safety, and he was vocal and outspoken about the need for improvement.  To that end, Plaintiff would speak with patients about the need to follow up with the scheduling department if they did not hear anything within 7 to 14 days after their visit.

47.     Plaintiff realized in late December or early January of 2019 that the arrangement with the Hospital was not working out.  Plaintiff informed Mr. Ehmke at DLT that he could not effectively treat patients under the circumstances at the Hospital.  Plaintiff also asked Mr. Ehmke to shorten his assignment at the Hospital and find him a locum position elsewhere.  Upon information and belief, DLT communicated these matters directly to the Hospital.

48.     Despite Plaintiff's efforts to improve the Hospital's scheduling processes and enhance patient care, the scheduling problems at the Hospital persisted.

49.     On March 7, 2019, the Hospital's Chief Executive Officer, Mr. Bill Patten, made the decision to end Plaintiff's locum assignment based upon Plaintiff's vocal criticism of the Hospital's scheduling processes and Plaintiff's direct interpersonal communication style, which had drawn criticism from members of the Hospital's staff.

50.     Mr. Patten was aware that terminating Plaintiff's locum assignment could have serious ramifications on Plaintiff's career.  Mr. Patten knew that taking adverse action against Plaintiff's privileges at the Hospital would negatively affect his future employment prospects and professional reputation.

51.     Mr. Patten, however, did not speak with Plaintiff about ending his locum assignment.  Neither Mr. Patten nor anyone else at the Hospital prepared a letter to Plaintiff notifying him that his locum assignment was being terminated.

52.     On March 8, 2019, Mr. Schenck informed Plaintiff that it was his last day at the Hospital.  Mr. Schenck did not tell Plaintiff that his locum assignment was terminated for cause. Nobody else at the Hospital told Plaintiff that his locum assignment was being terminated for cause.  Plaintiff had previously informed DLT that he wanted to end his locum assignment at the Hospital early, and he assumed that his assignment at the Hospital ended because DLT found him an alternative locum assignment.

53.     Plaintiff called DLT to discuss the ending of his locum assignment at the Hospital. Nobody at DLT informed him that the Hospital had terminated his assignment at the Hospital for cause or the reasons underlying the termination.

54.     Plaintiff's clinical privileges automatically expired upon the termination of his locum assignment at the Hospital on March 8, 2019.

55.     Plaintiff returned to California after his last day at the Hospital.  Plaintiff did not hear from anyone at the Hospital regarding his termination.  He did not hear from anyone at DLT either, despite his efforts to speak with Mr. Ehmke and others about what had occurred.

56.     Although Plaintiff's clinical privileges had automatically expired upon the termination of his locum assignment on March 8, 2019, the Hospital's Credentials Committee took up the issue of Plaintiff's clinical privileges during a Credentials Committee meeting on April 4, 2019.

57.     Nobody from the Hospital, the Hospital Medical Staff, the Credentials Committee, the Medical Executive Committee, or the Board ever notified Plaintiff that the Credentials Committee intended to take up the issue of his clinical privileges.

58.     Nobody from the Hospital, the Hospital Medical Staff, the Credentials Committee, the Medical Executive Committee, or the Board ever notified Plaintiff that the Credentials Committee intended to take action against his clinical privileges.

59.     Plaintiff had no knowledge that the Credentials Committee was going to meet or take action against his clinical privileges on April 4, 2019.

60.     Plaintiff was not provided with notice of the Credentials Committee's meeting on April 4, 2019, and he was not given an opportunity to attend the meeting or otherwise defend himself against the allegations levied against him.

61.     Mr. Patten attended the Credentials Committee meeting on April 4, 2019.  Mr. Patten believed that the Hospital Medical Staff was annoyed, upset, or angry about Plaintiff's vocal criticism of the scheduling processes at the Hospital and his direct interpersonal communication

style.  Mr. Patten believed that the Hospital Medical Staff wanted to make a point that any subsequent employer would know about Plaintiff's behavior.

62.     The Credentials Committee voted to revoke Plaintiff's clinical privileges at the Hospital on April 4, 2019.  The Credentials Committee did so even though Plaintiff's clinical privileges automatically expired almost a month earlier, on March 8, 2019.  The Credentials Committee could not lawfully revoke Plaintiff's clinical privileges if they did not exist.

63.     On April 19, 2019, the Hospital filed a false and defamatory adverse action report about Plaintiff with the National Practitioner Databank ("NPDB") without a legitimate, lawful basis to do so.

64.     The NPDB is a web-based repository of reports containing information on medical malpractice payments and certain adverse actions related to health care practitioners, providers, and suppliers. Established by Congress in 1986, it is a workforce tool that prevents practitioners from moving state to state without disclosure or discovery of previous damaging performance.

65.     Reporting entities must submit adverse action reports to the medical board of the State in which the adverse action occurred, either themselves or through the NPDB's electronic report forwarding service.

66.     Health plans, medical malpractice insurers, and hospitals query the NPDB during the credentialing process and use the information in the NPDB to make decisions concerning credentialing and insuring physicians.

67.     The adverse action report that the Hospital submitted to the NPDB stated that Plaintiff's clinical privileges were unanimously terminated by the Hospital Medical Staff Credentials Committee, even though Plaintiff's clinical privileges had expired almost a month before the Credentials Committee took up the issue of Plaintiff's clinical privileges.

13

68.     The adverse action report also falsely stated that DLT had dropped Plaintiff from their service panel.  Plaintiff, however, was not dropped from DLT's service panel at the time of the report.

69.     The adverse action report also grossly mischaracterized a non-clinical interaction Plaintiff had with a female Hospital employee, claiming that when the employee told Plaintiff that he was "stressing her out," Plaintiff told the employee to "undress and get on the treadmill so that she could experience stress."

70.     The adverse action report further stated that undisclosed standard of care concerns had been forwarded to the Hospital's Professional Standards Committee, even though Plaintiff had never been made aware of any such concerns.  The statements regarding standard of care concerns gave recipients of the report the impression that Plaintiff did not appropriately care for patients.

71.     The adverse action report also piled on Plaintiff with a litany of alleged interpersonal conflicts that Plaintiff had with Hospital staff to ensure that recipients of the report would believe that Plaintiff is a disruptive physician.

72.     The adverse action report was sent to all of the States where Plaintiff held a medical license, including New Mexico, and to the Federation of State Medical Boards.  As a result, several state's medical licensure boards initiated formal investigations into Plaintiff and his medical licenses.

73.     In the Summer of 2020, the Hospital withdrew the adverse action report about Plaintiff from the NPDB upon advice of the Hospital's counsel, Holland & Hart, LLP, and acknowledged that the NPDB report should not have been filed in the first place.  But this came too late to save Plaintiff's reputation and career.  Despite the withdrawal of the adverse action report, state licensing bodies, including the New Mexico Medical Board, refused to stop their

investigations of Plaintiff based upon their receipt of the improperly filed, false and defamatory adverse action report. But for the improper filing of the false and defamatory adverse action report, state licensure boards would not have initiated formal investigations into Plaintiff or taken action against his medical licenses.

74.    The New Mexico Medical Board issued a Notice of Contemplated Action against Plaintiff on May 13, 2020.

75.    A merits hearing took place on March 24, 25, and 26, 2021, before a Hearing Officer appointed by the New Mexico Medical Board.

76.    On July 8, 2021, the New Mexico Medical Board assessed a $3,000 fine against Plaintiff and suspended Plaintiff's license to practice medicine in New Mexico.

77.    The New Mexico Medical Board submitted an adverse action report to the NPDB report following its decision on July 8, 2021.

78.    As a result of Defendants' wrongful submission of the false and defamatory adverse action report about Plaintiff to the NPDB:

   a.    The New Mexico Medical Board suspended Plaintiff's license to practice medicine;

   b.    The New Mexico Medical Board filed an adverse action report with the NPDB;

   c.    Two insurers have removed Plaintiff as a provider;

   d.    Arkansas suspended Plaintiff's license and stated that he is an "ongoing danger" to patients;

   e.    Other state licensing boards, including North Dakota, Iowa, California, Washington, Massachusetts, and Oregon, are initiating or have initiated investigations against Plaintiff;

     f.   Allied Pacific of California and the American Board of Internal Medicine are initiating or have initiated investigations against Plaintiff;

     g.   California published Plaintiff's license suspension from New Mexico;

     h.   Plaintiff cannot obtain medical malpractice insurance;

     i.   Plaintiff cannot be credentialed at any healthcare facility; and

     j.   His last employer terminated his employment on December 13, 2021.

79.    Defendants' conduct has caused and continues to cause Plaintiff damages, including but not limited to the following, in an amount to be determined at trial:

     a.   Payment for services rendered by Plaintiff prior to his termination for which he was never paid;

     b.   Loss of past and future income;

     c.   Damages to Plaintiff's reputation;

     d.   Emotional distress;

     e.   Attorneys' fees which Plaintiff incurred for representation in connection with the revocation of his privileges and defense of state licensing bodies' investigations and administrative actions, including but not limited to the New Mexico Medical Board's investigation and administrative action, which currently exceeds $100,000; and

     f.   Attorneys' fees which Plaintiff has incurred and continues to incur for representation in connection with medical board investigations and actions in other jurisdictions, including North Dakota, Iowa, California, Arkansas, Massachusetts, Washington, and Oregon.

80.     Plaintiff is also entitled to punitive damages against Defendants to the extent their conduct was willful, wanton, fraudulent, in reckless disregard for Plaintiff's rights, or otherwise meets the standards under New Mexico law for imposition of punitive damages in order to punish Defendants and deter similar conduct by others in the future.

## COUNT I
## BREACH OF CONTRACT

81.     The Medical Staff Bylaws constitute a contract between Defendants and Plaintiff which includes express and implied covenants, including but not limited to those covenants implied by the Health Care Quality Improvement Act and New Mexico Review Organization Immunity Act.

82.     Defendants breached Article IX of the Medical Staff Bylaws by failing to follow the requirements relevant to taking corrective action.

83.     Defendants breached Article XIV of the Medical Staff Bylaws by:

   a.     Initiating a professional review action against Plaintiff's clinical privileges after his clinical privileges had automatically expired;

   b.     Initiating adverse action without a reasonable belief that Plaintiff's conduct constituted grounds for adverse action;

   c.     Failing to review the matter to determine whether grounds existed to initiate adverse action; and

   d.     Failing to designate one or more of its members to meet with Plaintiff in an effort to informally resolve the matter;

84.     Defendants also breached Article XIV of the Medical Staff Bylaws by revoking Plaintiff's clinical privileges without an opportunity for a hearing.

85.     Defendants further breached Article XIV of the Medical Staff Bylaws by:

a.  Initiating a professional review action against Plaintiff's clinical privileges after his clinical privileges had automatically expired;

b.  Failing to give Plaintiff prompt written notice that adverse action was initiated against him;

c.  Failing to provide Plaintiff with the reasons for the adverse action;

d.  Failing to inform Plaintiff that he was entitled to request a hearing on the adverse action;

e.  Failing to inform Plaintiff that failure to request a hearing constitutes a waiver of the right; and

f.  Failing to inform Plaintiff that he could be represented by an attorney at the hearing.

86.  Defendants breached the Medical Staff Bylaws by revoking Plaintiff's privileges in bad faith.

87.  Defendants breached Article XV of the Medical Staff Bylaws by submitting the adverse action report about Plaintiff to the National Practitioner Data Bank and New Mexico Medical Board without engaging in a reasonable effort to obtain the facts of the matter prior to reporting and knowing that the report contained false and defamatory information that would cause Plaintiff harm.

88.  Defendants also breached Article XV of the Medical Staff Bylaws by failing to comply with the requirements of the Credentialing and Privileging Plan.

89.  Defendants further breached the Medical Staff Bylaws because the submission of the adverse action report about Plaintiff to the National Practitioner Data Bank and New Mexico Medical Board was done with malice.

90.     Defendants' breaches of contract caused Plaintiff damages in an amount to be proven at trial.

## COUNT II
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

91.     Defendants had knowledge of Plaintiff's contract with DLT.

92.     Defendants played an active and substantial part in causing DLT to be unable to place Plaintiff in locum tenens assignments after his assignment at the Hospital.

93.     Defendants had no justification or privilege to interfere with Plaintiff's contractual relationship with DLT.

94.     Upon information and belief, Defendants acted with an improper motive to retaliate against Plaintiff for his reports concerning the adverse impact of patient scheduling issues on patient care.

95.     Defendants used improper means to interfere with Plaintiff's contractual relationship with DLT, including violations of the Medical Staff Bylaws recited above and submission of the false and defamatory adverse action report about Plaintiff to the NPDB.

96.     Defendants are liable to Plaintiff for their employees' or agents' conduct under the doctrine of *respondeat superior*.

97.     Defendants' conduct caused Plaintiff damages in an amount to be proven at trial.


## COUNT III
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

98.     Defendants knew that Plaintiff was licensed to practice medicine in multiple states and would seek locum tenens assignments or employment elsewhere after his assignment at the Hospital ended.

99.     Defendants knew that filing the adverse action report about Plaintiff with the NPDB would cause medical board investigations against Plaintiff in every state where Plaintiff was licensed and hinder Plaintiff's ability to obtain locum tenens assignments or employment elsewhere after his assignment at the Hospital ended.

100.    Defendants had no justification or privilege to interfere with Plaintiff's medical licenses and his ability to obtain locum tenens assignment or employment elsewhere after his assignment at the Hospital ended.

101.    Upon information and belief, Defendants acted with an improper motive to retaliate against Plaintiff for his reports concerning the adverse impact of patient scheduling issues on patient care.

102.    Defendants used improper means to interfere with Plaintiff's medical licenses and his ability to obtain locum tenens assignment or employment elsewhere after his assignment at the Hospital ended, including violations of the Medical Staff Bylaws recited above and submission of the false and defamatory adverse action report about Plaintiff to the NPDB.

103.    Defendants are liable to Plaintiff for their employees' or agents' conduct under the doctrine of *respondeat superior*.

104.    Defendants' conduct caused Plaintiff damages in an amount to be proven at trial.

**COUNT IV**
**DEFAMATION**

105.     Defendants published false statements of fact concerning Plaintiff in the NPDB report, including:

    a.  That DLT dropped Plaintiff from its service panel;

    b.  That Plaintiff "behaved in a grossly unprofessional and inappropriate manner;" and

     c.    That there were legitimate standard of care concerns regarding Plaintiff's care and treatment of patients.

106.    Defendants' submission of the adverse action report about Plaintiff to the NPDB also falsely implied that Defendants had followed the Medical Staff Bylaws and afforded Plaintiff a full and fair opportunity to address the matters stated in the report.

107.    The statements contained in the NPDB report are defamatory *per se*.

108.    Defendants knew that these statements were false or negligently failed to recognize that they were false or acted with malice in submitting the adverse action report about Plaintiff to the NPDB.

109.    Defendants did not have a privilege to publish the false and defamatory statements contained in the adverse action report about Plaintiff submitted to the NPDB, or alternatively abused any such privilege.

110.    The adverse action report about Plaintiff to the NPDB caused injury to Plaintiff's reputation.

111.    Defendants are liable to Plaintiff for their employees' or agents' conduct under the doctrine of *respondeat superior*.

112.    Defendants' conduct caused and continues to cause Plaintiff damages in an amount to be proven at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff requests judgment against Defendants for compensatory damages, including lost past and future income, attorney's fees incurred in defending against Medical Board proceedings, emotional distress, punitive damages to the extent that Defendants'

conduct satisfies the standards under New Mexico law for an award of punitive damages, pre- and post-judgment interest, costs, and any other relief to which Plaintiff is entitled in this action.

**JURY DEMAND**

Plaintiff demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**DAVIS & GILCHRIST, P.C.**

_____
Bryan J. Davis
Ellen A. Geske
1005 Marquette Ave. NW
Albuquerque, NM 87102
Tel. (505) 435-9908
Fax. (505) 435-9909
bryan@dglnm.com
ellen@dglnm.com

**MILLER STRATVERT P.A.**

_____
Dan A. Akenhead
P.O. Box 25687
Albuquerque, NM 87125
Tel. (505) 842-1950
Fax. (505) 243-4408
dakenhead@mstlaw.com