IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GEORGE J. MADERA, M.D.,

    Plaintiff,

v.     Case No. 1:22-CV-00285-MLG-SCY

TAOS HEALTH SYSTEMS, INC., d/b/a
HOLY CROSS HOSPITAL, BOARD OF
DIRECTORS OF HOLY CROSS HOSPITAL,
MEDICAL STAFF OF HOLY CROSS
HOSPITAL, and JOHN DOES 1-10.

    Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dr. George Madera ("Madera") worked as a locum tenens cardiologist at Taos Health Systems, Inc. ("Taos"), d/b/a Holy Cross Hospital ("Holy Cross"), from December 3, 2018, to March 8, 2019. Doc. 38 at 15 ¶ 42, 18-19 ¶ 52. Madera was hired through a staffing agency, Delta Locum Tenens ("DLT"), to fill staffing needs at Holy Cross until a retiring cardiologist was replaced. *Id.* at 7 ¶ 17.

Taos terminated Madera's employment on March 8, 2019, following complaints of disruptive behavior, including allegations that Madera raised his voice to employees, Doc. 78-2 at 16, made threats, *id.* at 13-14, refused to consult a cardiology patient because he wanted to avoid litigation, *id.* at 22, 59, and told an IT analyst that to experience "real stress" she should take off her clothing and get on a cardiac testing treadmill. *Id.* at 8.[1] Taos subsequently notified DLT that

---

[1] Madera claims he was not notified of the "for cause" firing. Doc. 84-1 at 15. Rather, Madera was under the impression that Holy Cross found a replacement physician, ending his assignment and causing his privileges to naturally lapse. *Id.*

1

Madera was fired for cause, and the agency responded via email that "Madera will be removed from [DLT's] eligible list of providers." Doc. 78-2 at 55. Taos administrators did not confirm that DLT had followed through on that course of action, and they later found out that DLT had not removed Madera from its service panel. *Id.* at 58.

A few weeks later, Taos was notified of patient care concerns that arose during Madera's time at Holy Cross. Doc. *Id.* at 11. Specifically, another physician alleged that Madera did not independently evaluate echocardiogram scans and changed a patient's medication without making any note of the change. *Id.* Taos initiated a peer review and referred the patient care incidents to Taos's credentialing committee, Doc. 78 at 5 ¶ 11, which voted unanimously to revoke Madera's clinical privileges on April 4, 2019. Doc. 38 at 21 ¶ 62. Madera was not notified of the committee's actions, and he was given neither notice nor opportunity to attend the meeting or defend himself. Doc 38 at 20 ¶¶ 57-58, 21 ¶ 60.

Taos filed an adverse action report with the National Practitioner Data Bank ("NPDB") on April 19, 2019. Doc. 78-2 at 2-4 (NPDB report dated April 19, 2019); *see* Doc. 38 at 23 ¶ 66. The NPDB report succinctly described the revocation of Madera's clinical privileges and preceding events, namely his unprofessional and inappropriate interactions with hospital staff. Doc. 78-2 at 3. But it also falsely indicated that DLT "had dropped him" from its service panel. *See id.* This report was sent to those states where Madera was licensed, including New Mexico, and the Federation of State Medical Boards. Doc. 37 at 14 ¶ 72; *see also* Doc. 38 at 24 ¶ 72. Over a year later, Taos withdrew the report from the NPDB, citing concerns that the document was inaccurate regarding Madera's status with DLT. Doc. 78 at 6-7 ¶ 15. When prompted by the reporting service to select a cause for withdrawal, Taos selected "[t]he report was not required to be filed; the action does not meet the legal reporting criteria." Doc. 84-1 at 1.

2

Upon learning about the NPDB report, Madera sued Taos, Holy Cross, the Board of Directors of Holy Cross, the Medical Staff of Holy Cross, and John Does 1-10 (collectively "Defendants") for defamation and intentional interference with prospective economic relations. Doc. 37. Madera claims that Defendants unlawfully revoked his clinical privileges after a "sham peer review process" and then filed a false report with the NPDB. *See id.* at 16-18; Doc. 84 at 3. He further alleges that these actions led to the loss of his license to practice medicine in New Mexico, along with other significant employment opportunities. Doc. 37 at 16-18. Defendants collectively move for summary judgment, claiming statutory immunity under state and federal law and arguing that Madera's claims fail on their merits. *See generally* Docs. 78; 88.

## STANDARD OF REVIEW

Summary judgment "is a drastic remedy and should be granted only with caution." *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 926 n.5 (10th Cir. 1985) To that end, when assessing a summary judgment motion, the Court examines the factual record and draws all reasonable inferences in the light most favorable to the nonmoving party. *EFLO Energy v. Devon Energy Corp.*, 66 F.4th 775, 787 (10th Cir. 2023). "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (citation omitted). Only when "there is no genuine dispute as to any material fact is the movant entitled to judgment as a matter of law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation omitted). "However, summary judgment may not be avoided by mere disagreement with factual contentions that are supported with competent evidence." *Mayer Botz Enters. LLC v. Cent. Mut. Ins. Co.*, 720 F. Supp. 3d 1081, 1082 (D.N.M. 2024).

> [A] party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the

3

> materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.

*Congress v. Gruenberg*, 643 F. Supp. 3d 203, 215 (D.D.C. 2022). "And where 'a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c),' the Court may 'consider the fact undisputed for purposes of the motion.'" *Mayer Botz Enters. LLC*, 720 F. Supp. at 1082 (citing Fed. R. Civ. P. 56(e)(2)).

## DISCUSSION

### I. The Health Care Quality Improvement Act's Immunity Provisions

The Health Care Quality Improvement Act ("HCQIA" or "the Act") requires healthcare entities to report any final professional review action that "adversely affects the clinical privileges of a physician for a period longer than 30 days" to the NPDB. 42 U.S.C. § 11133(a)(1)(A). "Congress passed the [HCQIA] 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.'" *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996) (quoting H.R. Rep. No. 99-903, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6286, 6384). To promote that objective, the Act provides immunity for certain conduct. First, 42 U.S.C. § 11111 grants limited immunity for damages arising from professional review actions, provided that the reviewing body meets the four standards specified in 42 U.S.C. § 11112(a). *See Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir. 1996) (discussing the immunity granted to peer review participants under Section 11111). Second, 42 U.S.C. § 11137(c) provides qualified immunity for persons or entities who publish a report to the NPDB "without knowledge of the falsity of the information contained in the report." As the statutory language indicates, Section 11137 applies to defamation claims, providing immunity even where an NPDB report contains false statements, so long as the reporter had no knowledge of the statement's falsity. *See Brown*, 101 F.3d at 1333-34 (considering

the application of Section 11137 immunity to a defamation claim); *see also Le Baud v. Frische*, 156 F.3d 1243, 1998 U.S. App. LEXIS 20311, at *17 (10th Cir. Aug. 20, 1998) (unpublished table case). To overcome this statutory presumption of immunity, a party must establish "sufficient evidence for a jury to conclude the report was false and that the reporting party knew it was false." *Brown*, 101 F.3d at 1334.

## II.     Consideration of Taos's Timely Assertion of Immunity

Against this legal backdrop, Madera first asserts that the Court should refrain from considering the Defendants' immunity defenses. Doc. 84 at 11-14. He claims the Defendants failed to timely raise the defenses in their answer and are therefore precluded from invoking any statutory immunity under Federal Rule of Civil Procedure 8(c). *Id.* A party may, however, constructively amend an answer to include an affirmative defense so long as there is no prejudice to the opposing party, nor "undue delay, bad faith, dilatory motive . . . , or repeated failure to cure deficiencies by amendments previously allowed." *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (quotation omitted). Madera nevertheless argues that Defendant's failure to include HCQIA immunity in their answer prejudiced him because he had no time to engage an expert witness on HCQIA issues and conduct discovery based on the expert's evidentiary needs. Doc. 84 at 12-13. The docket shows otherwise; both parties have thoroughly explored this issue in discovery. *See generally* Docs. 78; 78-2; 84; 84-1; and 88. And if Madera believed more information was necessary, then he could have sought additional discovery pursuant to Rule 56(f). *See, e.g.*, *Stonex Commodity Sols. LLC v. Bunkley*, No. 1:23-cv-00735, 2024 U.S. Dist. LEXIS 144111, at *5 (D.N.M. Aug. 12, 2024). Accordingly, the Court will permit the Defendants to "constructively amend the answer by means of the summary judgment motion." *Ahmad*, 435 F.3d at 1202 (internal quotation omitted).

## III.   Defamation

Madera alleges that Defendants published three false and defamatory statements of fact in the NPDB report including: (1) that Madera behaved in a grossly unprofessional and inappropriate manner, (2) that Defendants had legitimate standard of care concerns regarding Madera's care and treatment of patients, and (3) that DLT had dropped Madera from its service panel. Doc. 37 at 18 ¶ 91(a)-19 ¶ 91(c). The Court addresses each of these purportedly defamatory statements in turn.

Madera argues that the first statement—reporting unprofessional behavior—amounts to defamation because a reasonable jury could conclude the statement was false. Doc. 84 at 21. But in evaluating an NPDB report, the Court's role is not to evaluate whether the reported action was properly determined; instead, the analysis hinges on whether the report accurately reflects the action taken by the relevant entity.[2] *See Murphy v. Goss*, 103 F. Supp. 3d 1234, 1239 (D. Or. 2015), *aff'd*, 693 F. App'x 636 (9th Cir. 2017). Here, there is no evidence showing that Taos misrepresented the action it took against Madera or its reasons for doing so. Taos's incident management system contains several reports of Madera allegedly bullying or "chewing out" coworkers. Doc. 78-2 at 16-19. The record also contains internal emails detailing Madera's unprofessional conduct, including his statement to a female employee that she should undress and get on a treadmill. *Id.* at 8-9. It is undisputed that these incidents formed part of the basis for Taos's revocation of Madera's medical privileges. *See generally* Doc. 37; Doc. 84. Taos's statements in the NPDB report accurately reflect its actions and reasons for taking them. The statements

---

[2] In *Brown*, for instance, the Tenth Circuit found that a reporter was not entitled to immunity under Section 11137 because she falsely stated that a physician was disciplined for "negligence/incompetence/malpractice," when the physician was actually disciplined for breaching a clinical consultation agreement. 101 F.3d at 1334. The issue in *Brown* was not whether the facility's findings were true; instead, the reporter falsely portrayed the reasons for the disciplinary action, thus exposing her to liability. *Id.*

6

themselves are true and supported by independent evidence; Madera simply disagrees that they should be characterized as harassment. Accordingly, Defendants are entitled to immunity under Section 11137 because their statements on Madera's unprofessional conduct were not false.

The next statement—that Defendants had legitimate standard of care concerns regarding Madera's care and treatment of patients—fails to abrogate Defendants' immunity for similar reasons. Madera argues that this statement is false because Defendants had no concerns about his care when they filed the report, Doc. 84 at 21, but the record shows otherwise. Communications among Taos's leadership establish specific standard of care issues that predate the NPDB report, including Madera's refusal to consult with a patient, Doc. 78-2 at 22, and his prescription of medication without documentation. *Id.* at 11. Yet, Madera fails to provide any evidence suggesting these problems did not form part of the basis for the denial of his medical privileges. *See* Doc. 37 at 18-19; Doc. 84 at 15-16. There is no dispute that Defendants' statement in the NPDB report accurately described the decision to forward standards of care concerns to Taos's Professional Standards Committee. *See* Doc. 78-2 at 3. Defendants are thus entitled to Section 11137 immunity for this statement as well.

Defendants do not dispute the third statement at issue—that DLT had dropped Madera from its service panel—was false. Doc. 78 at 13-14. But evidence of falsehood alone is insufficient to rebut the presumption of immunity under Section 11137. The plaintiff must also provide evidence that the defendant knew the information in the report was untrue. *Murphy*, 103 F. Supp. 3d at 1239-40 (holding the "mere assertion by Plaintiff that one of the Defendants had actual knowledge that the report was false is insufficient to survive a motion for summary judgment[.]").

Madera fails to do so. It is undisputed that DLT informed Taos that Madera "will be removed from [DLT's] eligible list of providers," Doc. 78-2 at 55, and that Taos reported DLT

"had dropped" Madera from its service panel. *Id.* at 2-4. Madera asserts that based upon the verb tense in DLT's email (i.e., "will be removed"), there was "no reasonable basis" for Defendants to believe that DLT had removed Madera from its service. Doc. 84 at 16. That is not the standard under Section 11137, which requires Madera to present evidence indicating Defendants knew the statement was false at the time of the NPDB report. *See Brown*, 101 F.3d at 1334 (finding sufficient knowledge basis for abrogating immunity where the reporting party had copies of review findings contradicting the NPDB statements she prepared). Madera offers no evidence attesting to any Defendant's actual knowledge of the statement's veracity. To the contrary, the record shows that before the NPDB report was filed, DLT sent Taos an email stating, "Dr. Madera will be removed from our eligible list of providers and our malpractice carrier will be notified." Doc. 78-2 at 55. This statement ultimately proved untrue, but there is nothing to indicate that any Defendant would have been aware of that fact at the time the NPDB report was filed. So, not only were Defendants unaware that DLT had not removed Madera, but they also had good reason to believe that he had been or would be promptly removed. Lacking any knowledge that the statement was false, Defendants are entitled to immunity under Section 11137.

In sum, Section 11137 immunizes Defendants against liability for the statements contained in the NPDB report. Accordingly, Defendants are entitled to summary judgment on Madera's defamation claim.

## IV. Intentional Interference with Prospective Economic Relations

### A. Statutory Immunity

Defendants assert that the HCQIA's immunity provisions bar Madera's claims for intentional interference with prospective economic relations. Doc. 78 at 9-10. Not so. Section 11137 immunity applies to the filing and subject matter of an NPDB report. *See Brown*, 101 F.3d

8

at 1334. Madera's claim for intentional interference is based not only on the report and its contents, but also on the circumstances that led to its publication and whether Defendants could legally file it in the first place. Doc. 84 at 22. In other words, the interference claim extends beyond the NPDB report itself and into the underlying actions Defendants took to terminate Madera's clinical privileges. Section 11137's narrow immunity for the filing of NPDB reports is thus inapplicable. Moreover, the HCQIA's other immunity provision—Section 11111—provides qualified immunity only for those peer-review actions that meet the procedural requirements set out in Section 11112(a).[3]

Defendants also seek immunity under the New Mexico Review Organization Immunity Act ("ROIA"), Doc. 78 at 14, which provides immunity for anyone participating in a healthcare review organization unless the subject review was undertaken with malice. NMSA 1978, § 41-9-4. Therefore, the question for purposes of Defendants' state ROIA immunity hinges on whether they acted with malice in revoking Madera's credentials.

ROIA does not define the term "malice." *See* NMSA 1978, § 41-9-2. Pertinent New Mexico caselaw similarly provides little guidance. *See Leyba v. Renger*, 1992-NMSC-061, ¶ 13, 114 N.M. 686, 845 P.2d 780 (describing the purpose of the malice standard but leaving the term undefined). Predictably, the parties offer contrasting definitions. Madera draws from the punitive damages context, where the New Mexico Supreme Court defined malice as "the intentional doing of a wrongful act without just cause or excuse." *Romero v. Mervyn's*, 1989-NMSC-081, ¶ 25, 109 N.M. 249, 784 P.2d 992. Defendants ask the Court to apply a higher defamation standard, which requires a statement be "made with knowledge that the statements were false or with reckless

---

[3] Defendants have not argued how Section 11111's immunity applies here, *see generally* Docs. 78; 88, and the Court declines to do so on their behalf.

disregard of whether they were false or not. It is not enough for Plaintiff to show ill will on the part of [a defendant]." *Leyba v. Renger*, 874 F. Supp. 1218, 1224 (D.N.M. 1994).

While neither standard maps cleanly onto a prospective interference claim, Madera's proposed definition comports with the traditional understanding of the term. *Malice*, Black's Law Dictionary (12th ed. 2024) (defining malice as "The intent, without justification or excuse, to commit a wrongful act."). Moreover, his approach is consistent with relevant state decisional authority. The New Mexico Supreme Court has observed that ROIA's immunity is qualified for a reason: "Malice in the process destroys the integrity of the process, the review is in fact not impartial, and the public interest is not served." *Leyba*, 1992-NMSC-061, ¶ 13. In providing qualified immunity to review organizations, the New Mexico Legislature recognized that ROIA has high potential for abuse, since "[p]ossession of hospital privileges . . . is crucial to a physician's success, and a negative decision could be tantamount to excluding a doctor from the profession as a whole." *Id.* The standard for malice under ROIA thus derives not from the higher defamation standard, but from New Mexico law's preference for affording "relief for wrongs intentionally and maliciously committed[.]" *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 52, 109 N.M. 386, 785 P.2d 726.

In this case, Madera has produced sufficient evidence to establish a genuine issue of fact as to whether Defendants acted with malice. The record shows an ongoing disagreement about patient scheduling procedures, Doc. 78-2 at 13, 59, as well as friction in the interactions between Madera and Taos employees. *Id.* at 16-21. That friction was demonstrated by Holy Cross's Chief Executive Officer, Bill Patten, who testified that he felt "really upset" that Madera implied that Holy Cross was a "podunk" hospital before his credentials were up for review, stating that the dispute was "more than professional. This was personal." Doc. 84-1 at 49, 140:11-16; 141:11-12.

10

And the Court cannot overlook Defendants' failure to comply with HCQIA Section 11112(a)'s requirement that Madera be provided with notice and a hearing before his credentials were revoked and the matter reported to the NPDB. *See* Doc. 84-1 at 40, 50:4-13 (Patten testifying that Madera was informed that his credentials had been revoked only after Taos's credentialing committee voted to do so); *see also* Doc. 38 at 20 ¶¶ 57-58 (Defendants' admission that they did not inform Madera of the proceeding or provide him with a hearing).

Given the acrimonious nature of the conflict between the parties, the Court finds that Madera has raised a colorable inference that Defendants acted with malice in revoking Madera's credentials. *See Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) ("To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."). Accordingly, summary judgment under ROIA's immunity provision is improper here.

### B. Merits of the Claim

Defendants maintain that summary judgment is appropriate on the substance of Madera's claim for intentional interference with prospective economic relations, which requires him to show that Defendants acted with improper motive or means in terminating his employment.[4] Doc. 78 at 21-22. Madera concedes that the record does not support his claim under an improper motive

---

[4] New Mexico courts generally refer to this tort as "intentional interference with prospective contractual relations." *See M & M Rental Tools, Inc. v. Milchem, Inc.*, 1980-NMCA-072, ¶¶ 12-14, 94 N.M. 449, 612 P.2d 241, (noting that intentional interference with prospective contractual relations is an appropriate tort claim for interference with "business relations" or "economic expectancies" when there is no contract). The Tenth Circuit has therefore looked to New Mexico case law on prospective contractual relations when analyzing claims for interference with prospective economic relations. S*ee Simon v. Taylor*, 794 F. App'x 703, 712-13 (10th Cir. 2019).

theory. Doc. 84 at 22 n.4. The crux of the dispute is thus whether Defendants acted with improper means. *Id.* at 24.

New Mexico courts have adopted the Restatement (Second) of Torts § 766B (1979), which creates liability for interference with prospective contractual relations when the interference consists of either causing a third party not to enter or continue the prospective relation with the plaintiff or preventing the plaintiff from acquiring or continuing prospective relations.[5] *See M & M Rental Tools, Inc.*, 1980-NMCA-072, ¶ 20. To prove this sort of interference claim, the plaintiff must show that the defendant acted with either an improper motive or through improper means. *See Kelly v. St. Vincent Hosp.*, 1984-NMCA-130, ¶ 25, 102 N.M. 201, 692 P.2d 1350. "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violations of business ethics and customs." *Zarr v. Wash. Tru Sols., LLC*, 2009-NMCA-050, ¶ 11, 146 N.M. 274, 208 P.3d 919. At the same time, "bare allegations of violation of bylaws or procedural due process, without more, do not make out a claim of improper means[.]" *Kelly*, 1984-NMCA-130, ¶ 30. Instead, the means must be shown to have been "innately wrongful or predatory in character." *Id.* New Mexico courts do "not require that wrongful or improper means under contractual interference first satisfy the elements of another, independent tort." *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 20, 125 N.M. 748, 755, 965 P.2d 332. Such a requirement would negate the intentional interference tort, which seeks "to impose liability for contractual interference when the means of interfering was not tortious or otherwise unlawful in itself." *Id.*

---

[5] The parties do not dispute that Madera's prospective economic and contractual relations were harmed by the revocation of his credentials and the subsequent NPBD report. *See* Doc. 78 at 21-22; Doc. 88 at 22-24.

Accordingly, the key consideration in determining whether conduct is predatory for an improper means theory is whether conduct "that is not otherwise tortious . . . becomes tortious when it results in the wrongful interference with another's contractual relations." *Id.* ¶ 21.

Madera's improper means theory is predicated on allegations that Defendants were not obligated to file the relevant NPDB report and that they used the report to harm his future employment prospects. Doc. 84 at 15, 22-23. Madera contends that his clinical privileges expired automatically with his termination on March 7, 2019, when Taos terminated his locum tenens assignment, and that any further action was improper. *Id.* at 2, 22. Defendants argue their actions were permissible because Madera's privileges did not end in the natural course of employment but were instead revoked by the credentialling committee. Doc. 78 at 5 ¶ 11. They further maintain that a record of complaints and reported incidents justified the credentialing committee's actions, *see id.* at 5 ¶ 11, 8, and that Madera's claim is substantively deficient under New Mexico law. Doc. 88 at 11.

The parties' contrasting positions, and the evidence presented in support of their theories, raise factual issues precluding summary judgment. *See Seamons*, 206 F.3d at 1026. First, the evidence shows a genuine dispute as to when and how Madera's clinical privileges expired. Patten testified that Taos's credentialing committee revoked Madera's clinical privileges on April 4, 2019. Doc. 78-3 at 22, 84:17-21. But other employees testified that Madera's privileges terminated automatically when his locums tenens contract was terminated on March 8, 2019. *See* Doc. 84-1 at 23, 296:26-24, 297:1 (testimony of Taos's medical staff coordinator Patrica Hendricks stating that Madera's "privileges ran contiguous with his assignment" and were "temporary [and] specific to the dates he would provide service"); 25, 163:9-24 (testimony from Taos's chief of staff that Madera's clinical privileges automatically terminated with his employment). Additionally,

Defendants' choice to withdraw the NPDB report because it "was not required to be filed" and "[did] not meet the legal reporting criteria" calls into question whether they should have filed the report in the first instance. *See* Doc. 84-1 at 1.

As it stands, the Court cannot conclusively determine whether Madera's privileges expired naturally or were terminated by Taos's credentialling committee. If Madera's privileges terminated automatically with his employment, Defendants should not have reported that his privileges were revoked as a result of a professional review action. *See* 42 U.S.C. § 11151(9) (defining a professional review action as one "which is taken or made in the conduct of a professional review activity"); Health Res. & Servs. Admin., U.S. Dept. of Health and Human Servs., NPDB Guidebook (2018), at E-44 (advising that terminations not resulting from a formal professional review action are not reportable events under the HCQIA). Under these circumstances, Defendants' choice to report Madera would be a wrongful use of the NPDB's reporting procedures and an improper means of interfering with Madera's future economic prospects. On the other hand, if Madera's privileges did not terminate until the revocation decision on April 4, 2019, the subject NPDB report would not be facially improper because it detailed a professional review action taken against Madera, as that term is contemplated by Section 11151(9). Unable to conclusively resolve the matter—and finding that a reasonable jury could go either way—the Court finds summary judgment improper.

Madera further asserts that Defendants did not notify him that the credentialling committee would review his clinical privileges after his contract ended and did not provide him an opportunity for a fair hearing.[6] Doc. 84 at 22-23. He has produced support for that contention including

---

[6] Defendants respond that "bare allegations of violation of bylaws or procedural due process" are insufficient to support a claim of improper means. *Kelly*, 1984-NMCA-130, ¶ 30. But as explained, Madera has provided more than bare allegations.

evidence that Defendants failed to provide him with notice of the April 4, 2019, revocation proceedings and an opportunity to be heard at them. *See* Doc. 84-1 at 41, 183:7-10 (testimony from Taos's chief of staff confirming that he did not inform Madera that his clinical privileges would be reviewed after his termination); 40, 50:4-13 (testimony from Patten that Madera was not notified about the revocation of his privileges until after the credentialling committee's decision).[7] The only record evidence showing that Defendants directly informed Madera that any of his clinical actions had been reviewed is a letter dated August 21, 2020, over a year after Defendants revoked his privileges and reported him to the NPDB. *See* Doc. 84-1 at 2.

The HCQIA compels reviewing organizations to comply with procedural safeguards in professional review actions—namely, to provide physicians with notice and a hearing. *See* 42 U.S.C. § 1112(a)(3) ("[A] professional review action must be taken . . . after adequate notice and hearing procedures are afforded to the physician[.]"); 42 U.S.C § 1112(b) (requiring thirty-days' notice and a hearing before a professional review action is taken). Moreover, Defendants' bylaws mandate that practitioners must be given "an opportunity for a hearing" before revocation of their clinical privileges. Doc. 10-1 at 26. Madera has provided evidence that Defendants failed to comply with these procedures. *See* Doc. 84-1 at 41, 183:7-10; 40, 50:4-13. He has also produced evidence tending to show that Defendants acted maliciously by revoking his credentials and reporting him to the NPDB, as discussed *supra*, Section III(A). *See Zarr*, 2009-NMCA-050, ¶ 11 (stating that the nature of the conduct is relevant in determining improper means).

In sum, when viewed in the light most favorable to Madera, the facts of this case raise a plausible inference that Defendants improperly terminated Madera's clinical privileges and then filed an NPDB report in order to harm his future economic prospects. *See EFLO Energy*, 66 F.4th

---

[7] The Defendants concede this point. Doc 38 at 20 ¶¶ 57-58.

at 787 (requiring the Court to view the record in the light most favorable to the non-moving party). The Court thus denies Defendants' Motion on Madera's claim for intentional interference with economic relations.

## CONCLUSION

For the reasons explained above, the Court grants in part and denies in part Defendants' Motion for Summary Judgment. Doc. 78. The Court grants the Motion as to Madera's defamation claim, which is dismissed. The Court denies the Motion as to his claim for intentional interference with prospective economic relations.

It is so ordered.

                                                UNITED STATES DISTRICT JUDGE
                                                MATTHEW L. GARCIA