# EXHIBIT B



124 Wellesley Dr SE
Albuquerque, NM 87106
505-697-9620
bryan@bryanjdavislaw.com

April 12, 2024

<u>**VIA EMAIL ONLY**</u>
Steven Guttierez
Austin W. Jensen
Holland & Hart, LLP
555 17th Street, Suite 3200
Denver, CO 80202

      **Re:**    **George Madera, M.D. v. Taos Health Systems, Inc.**
               **(USDC Civ. No. 22-285 MLG/SCY)**

Dear Steve and Austin,

This letter contains an offer to compromise a disputed claim pursuant to Judge Yarbrough's Order Setting Settlement Conference (Doc.76), and therefore may not be used inconsistently with Federal Rule of Civil Procedure 408 and the New Mexico Mediation Procedures Act, NMSA § 44-7B-1, *et seq.* Dr. Madera's position statement and opening settlement offer in advance of the April 26, 2024 settlement conference are set forth below. I want to preface the evidentiary and legal analysis with some background information about my experience with these cases that may be useful to Taos Health Systems's representative who will be attending the settlement conference, whom I assume will read this letter, too.

I have represented physicians in peer review, credentialing, and employment disputes with hospitals over the past twenty years. I estimate that I have handled more than fifty cases for physicians against hospitals in that timeframe ranging from negotiated separation agreements all the way to jury trials. I have seen a lot of good physicians get railroaded out of hospitals to remove a competitor, based on racial and sexual orientation animus, and out of personal hatred, all under the guise of "quality improvement" in the peer review context. I have seen medical executive committees and hospital administrations wield the sword of peer review to destroy good physicians' reputations and careers assuming that their misdeeds will never come to light and go unpunished due to the multitude of evidentiary privileges and liability immunities afforded them under state-law peer review privileges and the Health Care Quality Improvement Act (HCQIA).

I have had to litigate many of these disputes when the hospitals acted unreasonably and in bad faith to destroy my clients' reputations and careers, for example, when they failed to provide the physician with the due process required under medical staff bylaws and HCQIA. I have never lost a physician's case against a hospital. I have obtained seven-figure settlements and jury verdicts against hospitals in several of those cases, including in this United States District Court for the District of New Mexico.[1] The biggest lesson I have learned from trying these cases to juries is that if they believe that the hospital did not follow its own rules in taking adverse action against a physician's privileges, then the jurors will find a way to award the physician substantial damages despite all the factual and legal defenses that the hospitals raise.

I mention all this not to grandstand, but rather to make sure that your client understands that you are not dealing with novices who do not understand these case and how to win them. My hope is that this background information will make your client seriously consider Dr. Madera's settlement position and carefully evaluate the risk of going to trial in this case against us.

I.    **Summary of the Evidence and Legal Principles to Establish Liability.**

We believe the intentional interference claim is the stronger of the two claims in this case and most likely will make it to a jury, so we will focus on it here. I have litigated several intentional interference with economic relations claims for physicians, including trying one to a jury verdict for a neurosurgeon whose privileges were suspended and revoked in Oregon in 2019. That case had many similarities to Dr. Madera's worth discussion.

The Oregon jury did not like my client due to his harsh and condescending interactions with hospital administrators and staff as well as his pompous self-presentation at trial. He was the "smartest person in the room" in his own mind and let everyone know it. The hospital summarily suspended and then revoked his privileges after he had sued the hospital and members of the Medical Executive Committee twice for allege racial discrimination and anti-competitive conduct, both of which cases he lost, before I represented him in a third case alleging intentional interference with economic relations and defamation. The defamation claim was dismissed before trial and the intentional interference claim, based on violations of the medial staff bylaws and NPDB reporting, made it to the jury.

While the jurors thought my client was deplorable, they told us after the verdict that they were more angry that the hospital did not follow its own rules, the medical staff bylaws, in suspending and revoking his privileges and reporting him to the NPDB. The jury also found against the hospital on all of its immunity defenses under ROIA and Oregon's ROIA analogue, and awarded my client $1,500,000 for lost past income. Some of the jurors I spoke to after the

---

[1] *Osuagwu v. Gila Reg'l Med. Ctr.*, 850 F. Supp. 2d 1216, 1239 (D.N.M. 2012).

verdict told me that despite their dislike of my client and his behavior towards the hospital's administration and staff, they felt compelled to award substantial damages to teach the hospital a lesson, almost as if they were awarding punitive damages.[2]  I think that a jury in this case will be angry with Holy Cross for disregarding the medical staff bylaws and NPDB reporting rules, despite that they will not like how Dr. Madera allegedly behaved towards Holy Cross's administration and staff.

In terms of liability, we can establish Holy Cross's violations of the Bylaws and NPDB reporting rules to supply the "improper means" elements of the intentional interference claim. Our position is that Dr. Madera was subject to the bylaws due process provisions concerning revocation of his privileges notwithstanding the hospital's legal argument that he was not a "practitioner" and Elise Brennan's dubious opinion that Dr. Madera was not protected by the Bylaws due process provisions applicable to other medical staff members. It will not make sense to the jury that the Credentials Committee could do what they did to Dr. Madera without notice to him, an opportunity to defend himself, and the right to request a fair hearing.

Moreover, we have Dr. Madera's testimony and the Medical Board hearing testimony from Dr. Moore and Patricia Hendricks that they understood that Dr. Madera's privileges at Holy Cross expired upon termination of his locum tenens assignment such that there were no privileges for the Credentials Committee to revoke.  And the juror will wonder why the hospital claims Dr. Madera wasn't subject to the protections in the Bylaws but then voided the NPDB report in any event because "[t]he report was not required to be filed; the action does not meet the legal reporting criteria."

We can also establish that Holy Cross failed to follow the Bylaws Articles IX, XIV, and XV, in the manner in which the Credentials Committee revoked Dr. Madera's privileges and reported the unlawful revocation of Dr. Madera's privileges to the NPDB.  The jury is going to see the Void Report notation that "[t]he report was not required to be filed; the action does not meet the legal reporting criteria" as many times as Judge Garcia will allow us to present it to them.  Holy Cross's shifting explanations that it was based upon legal advice of Holland & Hart, LLC's attorneys Steven Guttierez and Lisa Carlson, then it was a business decision to avoid litigation, or it was that "[t]he report was not required to be filed; the action does not meet the legal reporting criteria," are going to make the jury doubt Bill Patten's veracity as well as scuttle Elise Brennan's opinion that the report could be voided for business reasons, to the extent that we do not get that opinion excluded before trial.

We can also establish that Holy Cross's revocation of Dr. Madera's privileges and the NPDB report, true false or otherwise, caused a cascade of damaging events: (1) DLT was no

---

[2] We did not seek punitive damages due to Oregon's rule that most of a punitive damages award goes to a state fund and not to the plaintiff.

longer able to place Dr. Madera in future locum tenens assignments, despite the automated messages he may have received from DLT after leaving Holy Cross; (2) malpractice insurers, third-party payors, and California IPAs dropped Dr. Madera, making him unemployable, as confirmed by the testimony of Dr. Hargrove-Brown; and (3) the states' medical board investigations and suspensions of his licenses.  Dr. Madera and Dan Akenhead can testify to these effects.  Holy Cross's defense that Dr. Madera was his own worst enemy and would not have been able to keep a job is beside the point that he could not get a job in the first place as a result of the NDPB report, which should never have been filed in the first place.

Finally, I think it is highly unlikely that Holy Cross will be able to get all of its key witnesses to a trial.  I am convinced that this logistical problem is a reason that many hospitals settle these cases instead of trying them.  The number of witnesses they need to produce at trial, and in this case many of them are no longer in New Mexico, creates gaps in the hospital's storyline and defense.  On the other hand, we can present Dr. Madera's case with minimal witnesses and an easy-to-follow storyline.

II.     Proof of Damages.

New Mexico law requires only that Dr. Madera prove that Defendants' conduct was "a cause" of his damages, not the only cause.  13-305 NMRA; UJI 13-1010 NMRA  ("It need not be the only cause, nor the last, nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which, in combination with it, causes the injury.")  We can establish through Dr. Madera's and Dan Akenhead's testimony that the toxic NPDB precipitated a chain reaction of adverse events—States' medical board investigations, licensure suspensions, insurers dropping Dr. Madera, and prospective employers refusing to consider Dr. Madera—that caused him economic damages outlined below:

1.  Lost past income March 2019 – April 2024 (5 Years):

Dr. Madera will testify at trial concerning his lost income.  He intends to rely on his personal knowledge of his cardiology practice income trends since 2010, his tax returns produced in discovery, as well as the attached 2023 MedAxiom Cardiovascular Provider Compensation and Production Survey.[3]

---

[3] We understand that most likely you will object to Dr. Madera's reliance on the survey at trial since he did not produce it in discovery.  Dr. Madera made us aware of this survey on April 11, 2024, and we are disclosing it to you as soon as we received it from him on April 12, 2024.  We would also agree to allow you to depose him on this topic via Zoom before trial in order to ameliorate any alleged prejudice in allowing him to rely on it at trial.

MedAxiom, page 48,  TABLE 8: PHYSICIAN COMPENSATION – CARDIOLOGY
      Actual Compensation (no benefits) per FTE Cardiologist, Year 2022
      Ownership Model
            Private
                  Interventional
                      75th Percentile        $787,662
                      90th Percentile        $997,122
                      Average = $892,392
            Integrated
                  Interventional
                      75th Percentile        $867,550
                      90th Percentile        $1,031,710
                      Average = $949,630
      Geographic Breakdown, Year 2022
            Northeast:  I had 2 Medical licenses in this geographic area.
                      75th Percentile        $681,270
                      90th Percentile        $768,625
                      Average = $724,947
            South:  I had 1 Medical license in this geographic area.
                      75th Percentile        $863,657
                      90th Percentile        $1,026,958
                      Average = $945,307
            Midwest:  I had 4 Medical licenses in this geographic area.
                      75th Percentile        $758,315
                      90th Percentile        $1,000,954
                      Average = $879,634
            West:  I had 5 Medical licenses in this geographic area.
                      75th Percentile        $692,020
                      90th Percentile        $742,658
                      Average = $717,339
    **Overall**
            **Interventional**
                      **75th Percentile        $856,500**
                      **90th Percentile        $1,018,730**
                      **Average = $937,613**

Actual Compensation per Work RVU, Year 2022:  Defined as Physician Actual Compensation (no benefits) per wRVU: • Physician reported W2 compensation divided by the calculated wRVUs reported by the CPT submission.

Ownership Model
    Private
        Interventional
            75th Percentile    $58.23
            90th Percentile    $78.41
            Average = $68.32
    Integrated
        Interventional
            75th Percentile    $74.97
            90th Percentile    $89.26
            Average = $82.11

Geographic Breakdown, Year 2022
    Northeast
            75th Percentile    $101.47
            90th Percentile    $289.84
            Average = $195.65
    South
            75th Percentile    $68.18
            90th Percentile    $81.99
            Average = $75.08
    Midwest
            75th Percentile    $77.50
            90th Percentile    $95.54
            Average = $86.52
    West
            75th Percentile    $78.72
            90th Percentile    $92.43
            Average = $85.57
Overall
    Interventional
            75th Percentile    $72.78
            90th Percentile    $88.04
            Average = $80.41

MedAxiom, page 49,  TABLE 9: PHYSICIAN PRODUCTIVITY – CARDIOLOGY
Work RVUs per FTE Cardiologist; Year 2022
    Ownership Model
        Private
            Interventional
                 75th Percentile    18,125
                 90th Percentile    21,730
                 Average = 19,927

Integrated
    Interventional
        75th Percentile      14,108
        90th Percentile      17,470
        Average = 15,789

Geographic Breakdown, Year 2022
    Northeast
        75th Percentile      10,781
        90th Percentile      13,027
        Average = 11,904
    South
        75th Percentile      15,247
        90th Percentile      19,552
        Average = 17,399
    Midwest
        75th Percentile      12,097
        90th Percentile      14,946
        Average = 13,521
    West
        75th Percentile      11,532
        90th Percentile      14,189
        Average = 12,860

Overall
    Interventional
        75th Percentile      14,872
        90th Percentile      18,934
        Average = 16,903

MedAxiom, page 56:
"Work Relative Value Units (wRVUs): • The Omnibus Budget Reconciliation Act of 1989 enacted a Medicare fee schedule; as of 2018, about 7,000 distinct physician services are listed. Based on classifications created by the American Medical Association under the Current Procedural Terminology (CPT) system, each service in the fee schedule is assigned a value under the resource-based relative value scale. • For each CPT code, a payment formula may contain three RVUs, one for physician work, one for practice expense and one for malpractice expense. This measure considers only the wRVU. • No adjustments are made for APP activities. • Zero wRVUs are given to CPT codes with the follow."

Therefore, compensation, using the above data, Actual Compensation per Work RVU page 48, Table 8, Overall, Interventional, Year 2022 X (multiplied by) Work RVUs per FTE Cardiologist; Year 2022, page 49, Table 9 , Overall, Interventional

    Ownership Model
        Private

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Interventional |  |  |  |  |  |
| 75th Percentile | $58.23 | X | 18,125 = | $1,055,418 |
| 90th Percentile | $78.41 | X | 21,730 = | $1,703,849 |
| Average = |  |  |  | $1,379,633 |
| **Integrated** |  |  |  |  |
| Interventional |  |  |  |  |
| 75th Percentile | $74.97 | X | 14,108 | $1,057,676 |
| 90th Percentile | $89.26 | X | 17,470 | $1,559,372 |
| Average = |  |  |  | $1,308,524 |
| **Geographic Breakdown, Year 2022** |  |  |  |  |
| Northeast |  |  |  |  |
| 75th Percentile | $101.47 | X | 10,781 | $1,093,948 |
| 90th Percentile | $289.84 | X | 13,027 | $1,887,872 |
| Average = |  |  |  | $1,490,910 |
| South |  |  |  |  |
| 75th Percentile | $68.18 | X | 15,247 | $1,039,540 |
| 90th Percentile | $81.99 | X | 19,552 | $1,603,068 |
| Average = |  |  |  | $1,321,304 |
| Midwest |  |  |  |  |
| 75th Percentile | $77.50 | X | 12,097 | $937,517 |
| 90th Percentile | $95.54 | X | 14,946 | $1,427,940 |
| Average = |  |  |  | $1,182,728 |
| West |  |  |  |  |
| 75th Percentile | $78.72 | X | 11,532 | $901,802 |
| 90th Percentile | $92.43 | X | 14,189 | $1,311,489 |
| Average = |  |  |  | $1,106645 |
| **Overall,** |  |  |  |  |
| Interventional |  |  |  |  |
| 75th Percentile | $72.78 | X | 14,872 = | **$1,082,384** |
| 90th Percentile | $88.04 | X | 18,934= | $1,666,949 |
| Average = |  |  |  | $1,374,666 |

Accordingly, if Dr. Madera was in the 75th Percentile for the past five years, his estimated average lost income would be approximately $1,082,384, minus his actual mitigation income, which is negligible for this time period, for a total approximate loss of $5,411,920.

2. Lost Future Income April 2024-2030 (6 Years).

Dr. Madera intended to practice cardiology as long as he could, well into his 80s and beyond if possible. We capped his work-life expectancy at 2030 for purposes of mediation only. Note

8

that cardiology is an aging specialty with more than a quarter of cardiologists being over age 61.[4]

Taking the same average income for lost last wages for another six years through April 2024, would be $6,494,304, before reduction to present value, which the jury can calculate pursuant to UJI 13-822 NMRA.

3. Attorney's Fees Incurred for State Medical Board Defense.

Dr. Madera has incurred attorneys' fees and costs in the amount of $171,059.64 defending himself against state medical board actions resulting from Holy Cross filing the NPDB report. Dr. Madera and Dan Akenhead will testify concerning these amounts.

4. Non-Economic Damages.

Dr. Madera is also seeking reputational and emotional distress damages which cannot be calculated and will be left to the discretion of the jury. Dr. Madera and his wife Julia will testify concerning non-economic damages of injury to his reputation and mental anguish and humiliation from the NPDB report and subsequent cascade of adverse events described above. There are a number of recent cases in which juries awarded substantial damages, including damage to reputation and emotional distress, to physicians based on sham peer review claims.[5]

5. Punitive Damages.

We believe that we will be able to establish a basis for a punitive damages award. Holy Cross's complete disregard for Dr. Madera's rights under the Bylaws, Bill Patten's rush to report him to the NPDB without consulting with counsel, inclusion of false information about DLT dropping Dr. Madera from its panel, the PSC's post-hoc attempt to legitimize the patient care concerns statements in the NPDB report eighteen months after Dr. Madera left Holy Cross (and the PSC's decision to close the matter without any action), and the ultimate acknowledgment by the hospital that it never should have reported Dr. Madera to the NPDB should be sufficient to meet at least the "reckless" and "wonton" standards for an award of punitive damages under UJI 13-1827 NMRA. New Mexico juries are known for awarding large punitive damages awards when given the opportunity.[6]

---

[4] MedAxiom, page 25.

[5] *See, e.g.,* https://www.reliasmedia.com/articles/145911-doctor-wins-defamation-suit-alleging-improper-peer-review-process. ($4.5m verdict); https://www.chron.com/business/article/Texas-appeals-court-affirms-6-4-million-verdict-14374463.php. ($6.4m verdict affirmed on appeal.)

[6] https://www.law.com/2023/01/26/new-mexico-jury-returns-52m-punitive-damages-verdict-in-insurance-bad-faith-suit/?slreturn=20240312132109. ($52m punitive damages verdict for physician in insurance bad faith case.)

III.    Settlement Offer.

Dr. Madera offers to settle this matter for a lump sum payment of $3,999,999.99 in exchange for execution of a general release of all claims he brought or could have brought in the case and dismissal of the action with prejudice.  This amount is based on discounted lost past income factoring in the risks of losing summary judgment or trial.  This figure does not factor in Dr. Madera's non-economic damages and the potential for a punitive damages award. We think this is an imminently reasonable starting point for negotiating a final and fair settlement of this matter at the settlement conference on April 26, 2024.

Yours very truly,

Bryan J. Davis, Attorney at Law, LLC

_____

Bryan J. Davis, Esq.

cc:

Dan Akenhead
Judge Steven Yarbrough